UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  15-CIV-80801-BLOOM

ALEXANDER PEKLUN, as Personal
Representative of the Estate of SERGEY
PEKLUN, deceased, and VIKTORIA
PEKLUN,

       Plaintiffs,

vs.

TIERRA DEL MAR CONDOMINIUM
ASSOCIATION, INC., MARIA
VERDUCE, and FRANK SPECIALE,

       Defendants.

_____/

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TIERRA
DEL MAR CONDOMINIUM ASSOCIATION, INC.'S MOTION FOR SUMMARY
JUDGMENT AND
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AGAINST
DEFENDANTS TIERRA DEL MAR CONDOMINIUM ASSOCIATION, INC. AND
MARIA VERDUCE REGARDING VIOLATIONS OF THE FLORIDA AND
FEDERAL FAIR HOUSING ACTS**

Plaintiffs, ALEXANDER PEKLUN, as Personal Representative of the Estate of

SERGEY PEKLUN, deceased, and VIKTORIA PEKLUN, by and through their undersigned

counsel and, pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, hereby file this Memorandum of

Law in Opposition to Defendant, TIERRA DEL MAR CONDOMINIUM ASSOCIATION,

INC.'S, Motion for Summary Judgment, filed September 16, 2015, and file this Cross-Motion

for Summary Judgment against Defendants, TIERRA DEL MAR CONDOMINIUM

ASSOCIATION, INC. and MARIA VERDUCE, for their violations of the Florida and Federal

Fair Housing Acts, and in support thereof state as follows:

## I.  SUMMARY OF ARGUMENT

TIERRA DEL MAR CONDOMINIUM ASSOCIATION, INC. ("TDM") and the President of its Board of Directors, MARIA VERDUCE ("Ms. Verduce"), violated the Federal and Florida and Federal Fair Housing Acts (hereinafter collectively referred to as "FHA") by unjustifiably revoking the reasonable accommodation they granted Sergey Peklun in 2011.

## STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, the Plaintiffs respond to TDM's Statement of Material Facts as follows:

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted. However, Defendant's statement omits mention of the material events that occurred between 2011 and February 21, 2013, including TDM's approval of Mr. Peklun's request for a reasonable accommodation in the fall of 2011.

6.    The contents of Ms. Platti's May 13, 2013 e-mail are admitted; however, Plaintiffs deny that TDM did not receive all the requested information.

7.    Denied. Mr. Wallis provided the Affidavit of Dr. Paul Murray, which stated that the animal was "trained to ameliorate sleep disturbance which in turn controls cardiac disability." *See* Affidavit of Dr. Paul Murry, M.D. (Exhibit W).

8.    Denied. Ms. Platti's e-mail asked Mr. Wallis to confirm if there were animal certifications, but did not reference training to be a service dog. See E-Mail from Platti to Wallis, May 22, 2013 (Exhibit V).

9.     Denied. TDM dishonored and effectively attempted to rescind the reasonable accommodation it had previously granted in 2011 *despite* Mr. Peklun's compliance with TDM's request for a re-application and submission of all requested documentation.

10.     Denied. There is no evidence that TDM's Corporate Resolution was motivated by receipt of "clarification on Mr. Peklun's disability and his request." There is no evidence that TDM received any additional clarification or documentation between the denial in 2013 and repeat approval it gave in 2014.

11.     Admitted.

12.     Admitted.

13.     Denied. Defendant's statement mischaracterizes the allegations in Count IV of Plaintiff's Second Amended Complaint. The allegations of violations of the FHA are not limited solely to TDM's denial of the accommodation request in 2013. *See* Second Amended Complaint (Exhibit JJ).

Pursuant to Rule 56.1, Plaintiffs submit the following additional material facts for the Court's consideration:

14.     Before immigrating to the United States, Mr. Peklun was exposed to significant levels of radiation and nuclear material while helping evacuate victims of the Chernobyl nuclear disaster. *See* Palm Beach County Office of Equal Opportunity, Final Investigative Report p. 118 - 119 (Exhibit II).

15.     As a result, Mr. Peklun suffered permanent disability due to multiple physical and psychological conditions, including cardiovascular disease which predisposed him to anxiety and depression, pulmonary disease or heart failure, hypertension, chronic renal failure, sleep apnea, and lower extremity edema, which substantially limited his ability to walk, breathe, and perform

manual tasks. *See* Final Investigative Report p. 117 (Exhibit II).

16.     In 2011, Mr. Peklun adopted a nine pound Maltese/Yorkshire Terrier dog named "Julia" that assisted Mr. Peklun on a daily basis. *See* First Amended Complaint ¶ 13 (Exhibit HH).

17.     Julia woke Mr. Peklun when he stopped breathing in his sleep and her companionship alleviated Mr. Peklun's stress, anxiety and depression. *See* Final Investigative Report p. 117 (Exhibit II); Letter from Dr. Paul Murry, M.D., Sept. 9, 2011 (Exhibit E).

18.     Mr. Peklun was a resident of the Tierra Del Mar Condominium Association in Boca Raton, Florida, which had a 'no pets' policy. *See* Certificate of Amendment (Exhibit A).

19.     In response to a Notice of Violation (Exhibit B), Mr. Peklun informed TDM that his doctor recommended "a pet as help for emotional support and healing therapy" and provided letters from his doctors documenting his disability and medical need for an emotional support animal. *See* Letter from Mr. Peklun, July 29, 2011 (Exhibit C); Letter from Dr. Paul Murry, Sept. 9, 2011 (Exhibit E).

20.     Dr. Paul Murry's letter explained that, as a result of sleep apnea syndrome, Mr. Peklun required 24 hour monitoring and his dog was trained to detect respiratory arrest and wake him to prevent dangerous consequences. *See* Letter from Dr. Paul Murry, Sept. 9, 2011 (Exhibit E).

21.     Dr. John A. DiSilvestro's note dated May 12, 2011 stated that Mr. Peklun "suffers from cardiovascular disease, which predisposes him to anxiety and depression" and that "separation from his pet may result in deterioration of his health and well being." *See* Final Investigative Report p. 29 (Exhibit II).

22.     TDM's attorney, Steven G. Rappaport, advised the Board President that the

correspondence from Mr. Peklun's physicians satisfied the FHA and recommended the accommodation be granted. *See* E-mails from Mr. Rappaport, Sept. 7, 2011 (Exhibit D) Sept. 14, 2011 and Sept. 23, 2011 (Composite Exhibit F).

23.    ***At the advice of their attorney, TDM's Board of Directors approved Mr. Peklun's request for a reasonable accommodation in the fall of 2011***. *See* Casey Aff. ¶ 7 (Exhibit Z), Howard Aff. ¶ 5 (Exhibit AA), Curcio Aff. ¶ (Exhibit BB), Barker Aff. ¶ 5 (Exhibit CC); TDM's Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint, ¶ 18, June 16, 2015 (Exhibit HH).

24.    TDM did not publish, record, or document its approval of Mr. Peklun's request and no written record existed of the Board's approval. *See* Notice of Final Investigative Report p. 117 (Exhibit II).

25.    The composition of TDM's Board of Directors and its management company changed in subsequent years, resulting in confusion about Mr. Peklun's right to keep Julia. *See* First Amended Complaint ¶ 19 (Exhibit B).

26.    On November 19, 2012, another TDM resident (Frank Speciale) sent the new management company (Royal Management Services) a letter demanding the removal of Mr. Peklun's dog because it allegedly exacerbated his allergies. *See* Letter from Frank Speciale, Nov. 19, 2012, (Exhibit G).

27.    Wendy Casey ("Ms. Casey") was President of TDM's Board of Directors when Mr. Peklun's accommodation was granted in 2011 and either informed Mr. Speciale that the accommodation had been fully investigated and granted in accordance with federal law or should have done so. *See* Casey Aff. ¶ 9 (Exhibit Z).

28.    Ms. Casey also explained that she understood Mr. Speciale's concerns, "since my

son also has very serious allergies including allergy to dogs and I live opposite to the Pekluns, no one lives closer than we do. If my son is not affected by the Peklun's dog then Mr Speciale who lives on another floor on the opposite side of the building did not have anything to worry about." *See* Casey Aff. ¶ 10; 21 (Exhibit Z).

29.     Moreover, Mr. Speciale served on the Construction Committee and knew that the association had sealed all vents from each condo to the hallway as part of a construction project to bring the property up to fire code and, therefore, air from individual condos could no longer circulate into the hallways. *See* Casey Aff. ¶ 11 (Exhibit Z).

30.     Numerous other Board members also testified that they rarely, if ever, saw Mr. Peklun's dog outside his condominium unit. *See* Casey Aff. ¶ 22 (Exhibit Z); Howard Aff. ¶ 9 (Exhibit AA); Curcio Aff. ¶ 5 (Exhibit CC); Barker Aff. ¶ 6 (Exhibit CC).

31.     In November 2012, Ms. Verduce was President of TDM's Board of Directors and very good friends with Frank Speciale. *See* Casey Aff. ¶¶ 8, 12 (Exhibit Z); Howard Aff. ¶ 7 (Exhibit AA).

32.     Although Ms. Verduce knew the Board approved the accommodation in 2011, she did not inform the new management company or the new Board members of same. *See* Casey Aff. ¶ 8, 13 (Exhibit Z), Howard Aff. ¶ 7 (Exhibit AA).

33.     On November 27, 2012, TDM sent Mr. Peklun a Notice of Violation for an unauthorized pet (Exhibit H).

34.     Ms. Casey informed the new management company, Royal Management Services ("RMS"), that Mr. Peklun had been granted an accommodation when she was Board President in 2011 and provided all the documentation obtained in 2011, including the opinion of TDM's attorney that Mr. Peklun was entitled to the accommodation. *See* Casey Aff. ¶¶ 13 (Exhibit Z);

*see also* Emails from Mr. Rappaport to Ms. Casey (Exhibit D and Composite Exhibit FF).

35.    In January 2013, representatives from RMS and Ms. Verduce exchanged e-mails wherein Ms. Verduce wrongfully demanded that Mr. Peklun reapply for an accommodation to reconfirm his need for the dog, which she claimed should be done yearly. *See* E-mail exchange between RSM and Ms. Verduce, Jan. 3 – 4, 2013, (Composite Exhibit I); Casey Aff. ¶ 14 (Exhibit Z).

36.    RMS representatives told Ms. Verduce that the matter should be sent to the association's legal counsel, but Ms. Verduce insisted that there was no need to go to counsel. *See* E-mail exchange between RSM and Ms. Verduce, Jan. 3 – 4, 2013, (Composite Exhibit I).

37.    In an e-mail dated January 4, 2013, RMS President Steve Weil told Ms. Verduce, "[b]efore sending a reconfirmation to Mr. Peklun we need an ok from legal counsel as if this is not properly handled it can result in a case being brought against the association by the county or the fed for ADA violations." *See* E-mail exchange between RSM and Ms. Verduce, Jan. 3 – 4, 2013, (Composite Exhibit I).

38.    In spite of its knowledge of possible federal law violations, RMS sent Mr. Peklun a letter on February 21, 2013 demanding that he complete a new application no later than March 1, 2013, nine (9) days later. The letter also stated that failure to comply would be "grounds for the withdrawal of the approval of the animal." *See* Letter from RMS, Feb. 21, 2013 (Exhibit J).

39.    Mr. Peklun complied with the request and submitted another application and affidavits from his physicians. *See* Request for Reasonable Accommodation, Feb. 28, 2013 (Exhibit K); Service Animal & ESA Registration, Feb. 28, 2013 (Exhibit L); Affidavit and Letter from Dr. Paul Murry, Feb. 28, 2013 (Exhibit M); Affidavit of Dr. John A. DiSilvestro March 1, 2013 (Exhibit N).

40.     Mr. Peklun's family physician, Dr. Paul Murry, stated that Mr. Peklun was diagnosed with congestive heart failure, renal insufficiency, and sleep apnea and had difficulty with moving, could deteriorate rapidly within 24 hours, and that Julia was trained to facilitate his night-time breathing. *See* Affidavit and Letter from Dr. Paul Murry, Feb. 28, 2013 (Exhibit M).

41.     Mr. Peklun's cardiologist, Dr. John A. DiSilvestro, stated that Julia provided "alleviation of stress which would greatly exacerbate his medical conditions." *See* Affidavit of Dr. John A. DiSilvestro March 1, 2013 (Exhibit N) (emphasis in original).

42.     On March 10, 2013, Mr. Speciale sent RMS another letter (Exhibit O) detailing his conversations with Ms. Verduce about Mr. Peklun's application and demanding to see documentation that the dog had been approved in 2011.

43.     On March 11, 2013, RMS informed Mr. Speciale that the dog was approved by a prior board and, on the same day, Mr. Speciale responded that Ms. Verduce denied there was ever a prior board meeting and informed him that she told RMS to "do their job" and obtain the proper application so she could have a real board meeting. *See* Letter from RMS, March 11, 2013 (Exhibit P); Letter from Mr. Speciale, March 11, 2013 (Exhibit Q).

44.     In May 2013, TDM claimed that Mr. Peklun's application was incomplete because it was missing the signature page of Dr. Murry's affidavit and a copy of the service animal certification. *See* Final Investigative Report p. 119 (Exhibit II); E-mail from Ms. Platti, May 10, 2013 (Exhibit R).

45.     TDM did not notify Mr. Peklun of these missing documents in writing, as required by its reasonable accommodation policy. *See* Final Investigative Report p. 119 (Exhibit II).

46.     Instead, TDM sent Mr. Peklun another Notice of Violation on or about May 1,

2013. *See* Final Investigative Report p. 119 (Exhibit II).

47.    TDM did not inform Mr. Peklun about the allegedly incomplete application until they received a letter from Mr. Peklun's attorney responding to the May 1, 2013 Notice of Violation. *See* Final Investigative Report p. 119; *See* E-mail from Ms. Platti, May 10, 2013 (Exhibit II).

48.    On May 10, 2013, the property manager, Bonni Platti, e-mailed Ms. Verduce a copy of the letter from Mr. Peklun's attorney, Mr. Wallis, and asked whether Ms. Verduce wanted to request the missing documentation from Mr. Wallis. *See* E-mail from Ms. Platti, May 10, 2013 (Exhibit R). Ms. Platti's emails were produced in Defendant Verduce's Responses to Plaintiff's First Request for Production.

49.    Ms. Platti also stated, "[o]nce we have the completed application, the Board would review and consult their attorney re Frank's letters **so we can hopefully tell them to remove the dog immediately** based on the rights and health concerns of him and other residents in a designated pet free building." *See* E-mail from Ms. Platti, May 10, 2013 (Exhibit R) (emphasis added).

50.    On May 13, 2013, Ms. Platti emailed Mr. Wallis requesting the missing documents. Ms. Platti also stated (incorrectly) that Mr. Peklun's dog had never been approved and should therefore be removed until the Board reviewed the application. *See* E-mail from Ms. Platti, May 13, 2013 (Exhibit S).

51.    Two days after requesting the missing page from Mr. Peklun's attorney, Ms. Platti sent Mr. Peklun another Notice of Violation stating that if Mr. Peklun did not immediately remove the dog, TDM would proceed with legal matters to evict the dog and fine Mr. Peklun $100 per violation, per day, not to exceed $1000. *See* Final Notice of Violation, May 15, 2013

(Exhibit T).

52.     Mr. Wallis responded to Ms. Platti's correspondence the following day, informing her that they would promptly provide the information requested only three days prior. *See* Letter from Mr. Wallis, May 16, 2013 (Exhibit U).

53.     On May 21, 2013, Mr. Wallis sent TDM the missing page from Dr. Murry's Affidavit. *See* E-mail from Mr. Wallis, May 21, 2013 (Exhibit V); Affidavit of Dr. Paul Murry, notarized March 17, 2013 (Exhibit W).

54.     On May 31, 2013, TDM denied Mr. Peklun's accommodation and demanded that he immediately remove Julia from his condominium. TDM's attorney, Scott Shapiro, incorrectly asserted that Mr. Peklun lost whatever right he had to a reasonable accommodation by keeping the dog in his condominium unit without ever requesting an accommodation. *See* Letter from Scott R. Shapiro, May 31, 2013 (Exhibit X).

55.     On July 16, 2013, TDM initiated an arbitration action against Mr. Peklun with the Florida Division of Condominiums, Timeshares, and Mobile Homes. *See* Plaintiffs' Verified Complaint ¶ 43 (Exhibit GG).

56.     On October 25, 2013, Frank Speciale sued Mr. and Mrs. Peklun for injunctive relief and damages in the County Court for Palm Beach County, Florida. *See* Plaintiffs' Verified Complaint ¶ 45 (Exhibit GG).

57.     On January 21, 2014, Ms. Verduce executed an Affidavit as President of and on behalf of TDM in support of Mr. Speciale's suit. *See* Verduce Aff. (Exhibit Y).

58.     In her Affidavit, Ms. Verduce represented to County Court Judge Garrison that there was no record that the Board had ever granted Mr. Peklun an accommodation. *See* Verduce Aff. ¶ 6 (Exhibit Y).

59.     On March 11, 2014, Judge Garrison granted Mr. Speciale's request for an injunction and ordered that Mr. and Mrs. Peklun remove Julia from their condominium within three (3) days of the date of the Order. *See* Order Granting Plaintiffs' Verified Motion for Issuance of Preliminary Injunction (Exhibit DD).

60.     On May 5, 2014, the Palm Beach County Office of Equal Opportunity concluded that TDM had wrongfully denied Mr. Peklun's reasonable accommodation and discriminated against Mr. Peklun on the basis of his disability. *See* Final Investigative Report p. 119 – 120 (Exhibit II).

61.     On August 11, 2014, after Judge Garrison's Order of Injunction was entered, and without the submission by Mr. Peklun of any new, additional documents, TDM passed a Corporate Resolution approving Mr. Peklun's request for a reasonable accommodation. In the resolution, TDM stated that it did not intent to supersede and/or interfere with Judge's Garrison's Order. *See* Corporate Resolution (Exhibit EE).

62.     On December 4, 2014, Mr. Speciale requested that Judge Garrison find Mr. and Mrs. Peklun in contempt for failing to remove Julia from their condominium and issue civil sanctions against them. *See* Plaintiffs' Verified Motion for Entry of Order Holding Defendants in Contempt of Court, or in the Alternative Striking Defendants' Answer as Sanctions for Willful and Contumacious Disregard for Court Order (Exhibit FF).

63.     In support of his Motion, Mr. Speciale alleged that he heard a dog barking from inside Mr. and Mrs. Peklun's condominium, that Ms. Verduce also heard the dog barking, and she would file an affidavit with the Court stating as much. *See* Exhibit FF ¶¶ 3 – 6.

64.     Increasingly distraught and depressed due to his fear of losing his beloved Julia, Mr. Peklun committed suicide on the morning of February 12, 2015, the day he was scheduled to

appear in the County Court regarding Mr. Speciale's Motion for Sanctions. *See* First Amended Complaint ¶ 26 (Exhibit HH).

## II. STANDARD OF LAW

Summary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant makes that initial showing, the burden shifts to the nonmoving party, who "must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477 (11th Cir. 1991). A mere "scintilla" of evidence in favor of the nonmoving party, or evidence that is merely colorable or not significantly probative is not enough. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-251 (1986)). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer, 6 F. Supp. 3d 1272, 1279 (S.D. Fla. 2014) (quoting Anderson, 477 U.S. at 259).

## III. ARGUMENT

TMD's motion for summary judgment alleges that Mr. Peklun did not qualify as a disabled person and Julia did not qualify as an emotional support animal in 2013. Defendant's allegations are contrary to the overwhelming record evidence and its own admissions. TDM recognized Mr. Peklun's disability and need for Julia as an emotional support animal when it

granted Mr. Peklun's accommodation **on two separate occasions**, first in 2011 and again in 2014. TDM attempts to work around these explicit admissions by isolating its denial of Mr. Peklun's accommodation in 2013 from its prior and subsequent approvals. TDM alleges that Mr. Peklun did not provide the information necessary to validate his request in 2013 and, therefore, TDM did not discriminate against him when it denied his request on May 31, 2013.

First, TDM did not *deny* Mr. Peklun's accommodation in 2013, it arbitrarily *revoked* the accommodation it had already granted in 2011. TDM never addresses why the medically supported application Mr. Peklun submitted in 2011 was no longer sufficient in 2013. The record is devoid of any evidence showing improvement of Mr. Peklun's medical or emotional conditions or Julia's qualifications as an emotional support animal between 2011 and 2013. The only change in that time was Ms. Verduce's election as President of TDM's Board of Directors and willingness to enable Frank Speciale to attack Mr. Peklun's accommodation in County Court. Interestingly, TDM's Motion for Summary Judgment does not mention Ms. Verduce *once*, even though her actions as Board President are central to this lawsuit.

TDM also fails to address what changed between its denial of Mr. Peklun's accommodation in May 2013 and its approval in August 2014. TDM's motion for summary judgment merely states, '[o]nce it received some additional information, the TDM passed a Corporate Resolution on August 11, 2015 [sic], allowing Mr. Peklun to keep the dog in his Condominium Unit, provided that Mr. Peklun cleared the presence of the dog with Judge Garrison." *See* Def.'s M. Summ. J. page 19. TDM does not explain what "additional information" it received and the record reflects no supplemental applications or submissions from Mr. Peklun, his physicians, or his attorneys.  These defendants were apparently content to

13

participate in the trampling of a disabled resident's accommodation, so long as they could falsely attribute that trampling to the actions of another resident, or a misled County Judge.

The only information TDM alleged was missing from Mr. Peklun's application in 2013 was the signature page from Dr. Murry's Affidavit and a service animal certification. *See* Final Investigative Report p. 119 (Exhibit II). Mr. Peklun's attorney promptly sent TDM the missing signature page and TDM was in possession of multiple letters and affidavits from Mr. Peklun's physicians explaining that Julia was trained to detect respiratory arrest and helped alleviate Mr. Peklun's stress, which greatly exacerbated his cardiac condition. This was more than sufficient information to validate Mr. Peklun's disability and need for an emotional support animal.

"In response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability, (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. This inquiry need not be highly intrusive. In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary." Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer, 6 F. Supp. 3d 1272 (S.D. Fla. 2014) (quoting Overlook Mut. Homes, Inc. v. Spencer, 415 F. App'x 617, 621 - 22 (6th Cir. 2011)).

In Falin v. Condominium Ass'n of La Mer Estates, 2012 U.S. Dist. LEXIS 73453 (S.D. Fla. May 28, 2012), the Court held that the FHA and its implementing regulations included no training requirement and concluded that an emotional support animal may be a reasonable accommodation under the FHA when the animal is necessary for a disabled person to enjoy equal housing opportunity rights. Id. at *10. Accordingly, evidence that Mrs. Falin's emotional support dog had no specialized training was not dispositive of her claim. Id. Mrs. Falin suffered

from dementia and related disabilities and had a small dog, which her doctor opined helped remedy her anxiety, difficulty in sleeping, and related symptoms. Id. at *2, 12. The doctor also testified that if Mrs. Falin did not have her dog, she would become agitated, distraught and become difficult to take care of. Id. at *13. Although some of the doctor's admissions were unfavorable to the plaintiff, this Court held that the doctor's testimony was substantial evidence that would support a finding in Plaintiff's favor on the necessity element of his reasonable-accommodation claim. Id. at *13.

In Warren v. Delvista Towers Condo. Ass'n, 49 F. Supp. 3d 1082 (S.D. Fla. 2014), a psychiatrist diagnosed the plaintiff with Recurrent Major Depression Disorder and Post Traumatic disorder and recommended that the plaintiff's condominium association make a reasonable accommodation to its 'no pet' policy to the plaintiff to live with his assistance animal because of the dog's therapeutic use and function. Id. at 1084. The association argued that the accommodation was *per se* unreasonable because the dog was a pit bull, a breed banned by ordinance in Miami-Dade County. Before denying the association's motion for summary judgment, the court considered whether an emotional support dog is a reasonable accommodation under the FHA.

Although the FHA does not define a "reasonable accommodation," the Eleventh Circuit has held that an accommodation is unreasonable if "(1) it would impose an undue financial and administrative burden on the housing provider or (2) it would fundamentally alter the nature of the provider's operations." Id. at *1086 (citing Schwarz v. City of Treasure Island, 544 F.3d 1201, 1220 (11th Cir. 2008)). The Court found that an alternation in a "no pet" policy building to allow for an assistance animal is a reasonable accommodation and held that an emotional support animal as defined by the FHA is a reasonable accommodation. Id. at 1087. This Court reached a

similar conclusion in Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer, 6 F. Supp. 3d 1272 (S.D. Fla. 2014), where it held that allowing a disabled resident to keep a service dog would not fundamentally alter a condominium association's operations because it would still be able to offer housing. Id. at 1281.

The Warren opinion also addressed the nature of an emotional support dog's services and training. The Court relied on HUD final issued in 2008 providing that accommodations to allow an emotional support animal are generally reasonable and that emotional support animals do not require task specific training. Id. at 1087. Particularly, the rule states:

> "[E]motional support animals provide very private functions for persons with mental and emotional disabilities. Specifically, emotional support animals by their very nature, and without training, may relieve depression and anxiety, and help reduce stress-induced pain in persons with certain medical conditions affected by stress."

Pet Ownership for the Elderly and Persons With Disabilities, 73 FR 63834-01. The Court held that, in light of the HUD rule, it was of no moment whether the plaintiff's dog was specially trained. "The HUD rulings and notices make clear that an emotional support animal need not be specifically trained because the symptoms the animal ameliorates are mental and emotional, rather than physical." Warren, 49 F. Supp. 3d at 1088. The HUD allows for the denial of a reasonable accommodation if the animal poses a direct threat to the health, safety, or property of others. Id. at 1087. The presumption in favor of a reasonable accommodation is such that "the Fair Housing Act requires the existence of a significant risk — not a remote or speculative risk." Id. (citing 73 FR 63834-01 at 63837). Defendant TDM has not alleged and there is no evidence to support that Julia posed a threat to any other resident. On the contrary, she was a nine pound hypoallergenic dog who was rarely seen outside of Mr. Peklun's unit.

Mr. Peklun suffered from anxiety and depression secondary to multiple physical conditions, including sleep apnea syndrome, which Julia was trained to detect. Contrary to Defendant's allegation, sleep apnea syndrome has been recognized as a disability in numerous cases. *See, e.g.*, <u>Silk v. City of Chicago</u>, 194 F.3d 788, 798-99 (7th Cir. 1999) (sleep apnea affected the major life activities of breathing and sleeping and was sufficiently severe to qualify as a disability under the ADA); <u>Pack v. Kmart Corp.</u>, 166 F.3d 1300, 1305 (10th Cir. 1999) ("We hold that sleep is a major life activity[.] . . . Sleeping is a basic activity that the average person in the general population can perform with little or no difficulty, similar to the major life activities of walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching."); <u>Knorr v. Pepsico Food Services, Inc.</u>, 1999 U.S. Dist. LEXIS 4829, No. 97- CV-1819 (NPM), 1999 WL 200685, * (N.D. N.Y. 1999) (sleeping is a major life activity).

"The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." <u>Taylor v. Principal Fin. Group, Inc.</u>, 93 F.3d 155, 164 (5th Cir. 1996). Sleep apnea affects individuals differently. For some, it merely disturbs the individual's sleep and leaves them tired and irritable. *See, e.g.,* <u>Mont-Ros v. City of W. Miami</u>, 111 F. Supp. 2d 1338 (S.D. Fla. 2000). However, for others like Mr. Peklun, it poses a risk of respiratory arrest while the person is asleep. Mr. Peklun's dog was trained to detect respiratory arrest and wake Mr. Peklun, preventing possibly fatal consequences.

The issue in this case is not whether Mr. Peklun was entitled to a reasonable accommodation in 2013. It is clear that he was, as TDM itself first concluded and conceded in 2011. It granted approvals of the accommodation both *before and after* 2013, based on the same, consistent medical documentation of his disability and need for an emotional service animal.

Instead, the issue in this case is whether TDM and Ms. Verduce discriminated against Mr. Peklun in violation of the FHA by revoking the accommodation he was granted in 2011. And based on the record now before this Court, the Pekluns here suggest this question should be answered "yes" as a matter of law.

In Alley v. Les Chateaux Condo. Ass'n, 2010 U.S. Dist. LEXIS 121200 (M.D. Fla. 2010), the U.S. District Court for the Middle District of Florida found FHA violations in strikingly similar circumstances. Ms. Alley suffered from a paralyzed diaphragm and thyroid disorder, which impeded her ability to walk significant distances without shortness of breath. Id. at *2. In 2004, Ms. Alley purchased a condominium unit and underwent an interview with the members of the Board of Directors of the Condominium Association. Id. at *3. At that meeting, the Board approved Ms. Alley's request to use a golf cart on the premises pending a doctor's note, which Ms. Alley timely provided. Id.

Ms. Alley used her golf cart without incident until October 2008, when she received a letter from the newly-elected President of the Board of Directors requesting updated medical documentation. Id. at *4. The letter threatened removal of the golf cart at Ms. Alley's expense if the medical report was not received within 30 days. Id. Although Ms. Alley provided the requested medical report, the Board failed to respond to her request for the reasonable accommodation, but began to harass and threaten her. Id.

The Court denied the defendant's motions to dismiss and found that defendants effectively denied Ms. Alley's accommodation by requesting additional medical information after Ms. Alley had been using the golf cart for four years without complaint and failing to respond to Ms. Alley's request after she submitted the requested information. Id. at *10. In support of its holding, the Court cited Jacobs v. Concord Vill. Condo. X Ass'n, where the

Southern District of Florida found that "when defendant allowed plaintiff to use a ramp for 20 years and then refused to have it replaced when it was stolen, this fact supported plaintiff's contention that 'the Defendant acted intentionally to preclude the ultimate enjoyment of her condominium in violation of the Fair Housing Act, 42 U.S.C. §3604.'" Alley at *9-10 (quoting Jacobs v. Concord Vill. Condo. X Ass'n, 2004 U.S. Dist. LEXIS 4876, at *3 (S.D. Fla. 2004)).

Mr. Peklun was similarly granted an accommodation, which he enjoyed without issue until a newly elected President of the Board of Directors demanded updated medical documentation. Like Ms. Alley, Mr. Peklun complied and provided all the requested documentation. In this case, the Defendants went far and above a mere denial by revoking a previously granted accommodation, initiating an arbitration action against Mr. Peklun, and assisting another resident in his efforts to obtain an injunction against Mr. Peklun through false and misleading testimony.

This is precisely the type of case contemplated by the U.S. Supreme Court where the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). For these reasons, Plaintiffs respectfully request the Honorable Court deny TDM's Motion for Summary Judgment and grant Plaintiffs' Cross-Motion for Summary Judgment by holding that Defendants TDM and Ms.Verduce discriminated against Mr. Peklun in violation of the Florida and Federal Fair Housing Acts.

Lastly, Defendant's Motion for Summary Judgment briefly argues that Plaintiffs cannot plead punitive damages against TDM, pursuant to the Court's August 4, 2015 Order. Plaintiffs would point to pages 14 – 15 of the Order, which states that, as an "aggrieved person", Mr. Peklun's "widow can bring a claim under the FHA, and there is nothing in the FWDA which indicates that an award of punitive damages terminates upon the decedent's death." Furthermore,

this case contains substantial evidence of the evil motives and intentions of TDM's Board President, which sought to deprive Mr. Peklun of his emotional support animal and subject him and his family to years of harassment, stress, litigation, and associated expenses. Did those wrongful actions cause harm? The events conclusively show they did. TDM is liable for Ms. Verduce's actions as Board President and, therefore, Plaintiffs' punitive damages claim is properly plead against TDM.

**WHEREFORE,** Plaintiffs, ALEXANDER PEKLUN, as Personal Representative of the Estate of SERGEY PEKLUN, deceased, and VIKTORIA PEKLUN, respectfully request this Honorable Court deny Defendant, TDM'S, Motion for Summary Judgment and grant Plaintiff's Cross-Motion for Summary Judgment against Defendants, TIERRA DEL MAR CONDOMINIUM ASSOCIATION, INC. and MARIA VERDUCE, on violations of the Florida and Federal Fair Housing Acts.

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2015, the foregoing was electronically filed with the Clerk of Court using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel of parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ JACK SOBEL, ESQ.
Jack Sobel, Esquire
FL Bar No.: 240869
Schwed, Adams, Sobel & McGinley, P.A.
7111 Fairway Drive, Suite 105
Palm Beach Gardens, FL 33418
Email: eservice@schwedlawfirm.com
Phone: (561) 694-6079
Fax:     (561) 694-6089
Attorneys for Plaintiff(s)

## SERVICE LIST

VIA TRANSMISSION OF NOTICES OF ELECTRONIC FILING GENERATED BY CM/ECF, E-MAIL, FACSIMILE AND U.S. MAIL

Peter Wallis, Esq.
1937 East Atlantic Boulevard, Suite 104
Pompano Beach, FL 33060
Email: peter@jmwallislaw.com

David Israel, Esq.
12555 Orange Drive, Suite 4023
Davie, FL 33330
Email: disrael@israellawfl.com

David P. Bradley, Esq.
1645 Palm Beach Lakes Boulevard, 2nd Floor
West Palm Beach, FL 33401
Email: david.bradley@csklegal.com; adam.zhamukhanov@csklegal.com; Erica.bridgewater@csklegal.com

Richard B. Doyle, Esq.
506 S.E. 8th Street
Fort Lauderdale, FL 33316
Email: pleadings@loughen-doyle.com

Andrew M. Schwartz, Esq.
Andrew M. Schwartz, P.A.
4755 Technology Way, Suite 103
Boca Raton, FL 33431
Email: ams@amslaw.biz; cmp@amslaw.biz