**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 15-CIV-80801-BLOOM/VALLE**

ALEXANDER     PEKLUN,     as     Personal
Representative of the Estate of Sergey Peklun,
and VIKTORIA PEKLUN, individually,

       Plaintiffs,

v.

TIERRA   DEL   MAR   CONDOMINIUM
ASSOCIATION,   INC.,   MARIA   VERDUCE,
and FRANK SPECIALE,

       Defendants.

_____/

## <u>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

This cause is before the Court upon Defendant Tierra Del Mar Condominium

Association, Inc.'s Motion for Summary Judgment, ECF No. [44] ("TDM's Motion"), and

Plaintiffs, Alexander Peklun, as Personal Representative of the Estate of Sergey Peklun, and

Viktoria Peklun's Cross-Motion for Summary Judgment, ECF No. [52] ("Plaintiffs' Motion")

(collectively, the "Motions").  The Court has reviewed the Motions, all supporting and opposing

submissions, the record, and is otherwise fully advised.  For the reasons set forth below, the

Motions are denied.

### I. FACTS

On February 12, 2015, Sergey Peklun ("Peklun") took his own life.  His widow, Viktoria

Peklun ("Viktoria"), and his son, the personal representative of his estate, Alexander Peklun

(collectively, "Plaintiffs"), now seek to recover damages from Defendants, Tierra Del Mar

Condominium Association, Inc. ("TDM"), Maria Verduce ("Verduce"), and Frank Speciale

(collectively, "Defendants"), asserting that their calculated denial of his request for a reasonable accommodation for his dog, "Julia," resulted in Peklun's increasingly despondent attitude, ultimately culminating in his decision to end his life.  *See generally* Second Amended Complaint, ECF No. [36] (hereinafter, "SAC").   More specifically, Plaintiffs claim that Defendants are liable under theories of intentional infliction of emotional distress (Counts I through III) and violations of the Florida and Federal Fair Housing Acts, 42 U.S.C. § 3601, *et seq.* and Fla. Stat. § 760.20, *et seq.* (generally, the "FHA") (Count IV).  *See id.*  TDM moves for summary judgment on Count IV, while Plaintiffs' move for judgment on all claims.

TDM is a condominium association located in Boca Raton, Florida.  *See* TDM's Statement of Material Facts, ECF No. [44] ("TDM SOF") at ¶ 1.[1]  In 1985, TDM incorporated its Rules and Regulations into a corporate declaration, prohibiting any ambulatory animals from being kept in any unit.  *Id.* at ¶ 2.  At some point in 2011, TDM became aware that one of its residents, Peklun, was keeping a canine, "Julia," in his unit, and sent him a notice of violation. *Id.* at ¶ 3.  Responding to the notice, Peklun advised TDM that he was "going through a lot of medical problems," that his "doctor recommended a pet as help for emotional support and healing therapy," and that Julia would "become a service dog soon."  *Id.*  Peklun further informed TDM that "[a]ll the appropriate papers [were] in [the] process" of being obtained.  *Id.*; *see also* Palm Beach County Board of County Commissioners Office of Equal Opportunity, Investigative Report, FHAP Case No. 1300330, ECF No. [44-1] (hereinafter, "Commission Investigation") at 51.  On September 9, 2011, Peklun's family doctor, Dr. Paul Murry ("Dr. Murry") informed TDM that Peklun suffered from a variety of medical problems and had "been

---

[1] For ease of reference, where a fact is admitted to by the opposing party, the Court cites only to the originating statement of facts.

discovered to have sleep apnea syndrome." *See* September 9, 2011, Letter from Dr. Murry, ECF No. [51-5] at 1.The letter further noted that Julia "has been trained to detect [] respiratory arrest in him and to stimulate arousals to [avoid] dangerous consequences." *Id.* Dr. Murry also indicated that Julia "is identified as a certified act [sic] guideline." *Id.* Another treating physician, Dr. John A. DiSilvestro ("Dr. DiSilvestro"), confirmed that Julia assisted with Peklun's medical issues, stating that Peklun has "cardiac disease which predisposes him to anxiety and depression" and that Julia "provides him with comfort." *See* Commission Investigation at 29 (May 12, 2011 Letter from Dr. DiSilvestro).

In September 2011, Peklun was granted a reasonable accommodation by TDM's acting Board of Directors. *See* Affidavit of Wendy Casey, ECF No. [51-27] at ¶ 7 ("Mr. Peklun was granted the reasonable accommodation in September 2011."); Affidavit of Bert Howard, ECF No. [51-28] at ¶ 5 ("Mr. Peklun was granted the reasonable accommodation by the association at the end of summer 2011."); Affidavit of Alex Curcio, ECF No. [51-29] at ¶ 4 ("The Board of Directors granted Mr. Peklun the reasonable accommodation to keep his emotional support dog in September 2011."); Affidavit of Ronnie Barker, ECF No. [51-30] at ¶ 5 ("The Board of Directors, upon recommendation from the attorney, granted Mr. Peklun's request for reasonable accommodation to keep his emotional support dog."); *see also See* TDM's Requests for Admission, ECF No. [57-15] at ¶ 17.[2]   However, no hearing was held, nor was the accommodation published or recorded in any fashion. *See* Plaintiff's Statement of Facts, ECF No. [51] ("Pls. SOF") at ¶ 24.

---

[2] Although Defendants hotly dispute the fact that Peklun was granted an accommodation in 2011, the sworn testimony of various members of TDM's Board of Directors during the relevant time period, including the Board's acting president, confirm that the accommodation was granted, thereby refuting Defendants' self-serving and unsupported assertions to the contrary. *See* Aff. of Wendy Casey, ECF No. [51-27] at ¶ 7; Aff. of Bert Howard, ECF No. [51-28] at ¶ 5; Aff. of Alex Curcio, ECF No. [51-29] at ¶ 4; Aff. of Ronnie Barker, ECF No. [51-30] at ¶ 5.

In subsequent years, the composition of TDM's Board of Directors and its management company changed.[3]  Of particular note was the shift in leadership: Defendant Verduce became president of TDM's Board of Directors.  *See id.* at ¶ 31.  On November 19, 2012, another TDM resident, Defendant Frank Speciale ("Speciale"), sent TDM a letter requesting to see documentation that Julia was, in fact, a certified and trained dog for specific medical conditions. Letter from Speciale, ECF No. [57-11] at 1.  Speciale demanded that Julia be removed from the premises as her presence exacerbated his allergies, and threatened legal action if his request was not granted.  *Id.*  On November 27, 2012, TDM sent Peklun a "Notice of Violation" regarding Julia's presence.  *Id.* at ¶ 33; *see also* Notice of Violation, ECF No. [51-9] at 1.  In January 2013, TDM's management and Verduce exchanged emails wherein Verduce suggested that "an up-to-date application [] be sent to [] Peklun to re-confirm that he needs this medically necessary dog," suggesting that this fact "be confirmed yearly."  *See* Email Chain, ECF No. [51-10] at 5. Thereafter, on February 21, 2013, TDM demanded that Peklun submit an application for an Emotional Support Animal, and required the application be completed no later than March 1, 2013.  *See* Letter from TDM, ECF No. [51-11] at 1.  On February 28, 2013, Peklun submitted a "Request for Reasonable Accommodation" (hereinafter, "Request for Reasonable Accommodation" or "Request"), which indicated that, as a result of some unidentified disability, Peklun required Julia to "keep[] [him] company during the whole day when all [his] relatives are gone," and noted that with regard to his sleep apnea and depression, Julia "helps [him] [] wake up" and "keep[] [his] depression and stress" at bay.  *See* Request for Reasonable Accommodation, ECF No. [51-12] at 1.

---

[3] At this point, communications regarding Julia came from Royal Management Services, TDM's management company at the time.  Nevertheless, for the sake of simplicity, the Court continues to refer simply to "TDM."

15-CIV-80801-BLOOM/VALLE

Accompanying Peklun's request were the affidavits of Dr. Murry and Dr. DiSilvestro.[4] Dr. Murry reiterated that Peklun was being treated for sleep apnea syndrome.  *See* February 28, 2013 Murry Letter, ECF No. [44-9] at 2.  Stating that Julia is a "certified service animal," Dr. Murry claimed that Julia was "trained to detect respiratory arrest in [Peklun] and to stimulate arousal to pre[v]ent serious consequences."  *Id.*  Dr. DiSilvestro, on the other hand, was more ambiguous as to Julia's purpose, merely noting that Peklun has "limited function[ing] capacity from [a] cardiac and pulmonary standpoint" and requires Julia to "provid[e] comfort, companionship and security" and otherwise "alleviat[e] [] stress."  *See* Affidavit of Treating Physician dated March 1, 2013, ECF No. [51-15] at 1.  Subsequently, TDM requested additional information.

On or about May 1, 2013, TDM sent Peklun another Notice of Violation, which informed him of the incomplete nature of his application.  *See* Pls. SOF at ¶ 47; *see also* Commission Investigation at 119.  Communicating with Verduce on May 10, 2013, Bonnie Platti ("Ms. Platti"), a representative for TDM, inquired as to how Verduce would like to proceed with the matter.  *See* May 2013 Email Chain, ECF No. [51-19] at 1.  Ms. Platti noted that once Peklun's application was complete, the Board of Directors would review it and "hopefully tell them to remove the dog immediately based on the rights and health concerns of . . . other residents in a designated pet free building."  *Id.*  On May 13, 2013, Ms. Platti contacted Peklun's attorney, Peter Wallis ("Wallis"), acknowledging certain missing items from Peklun's Request, notably, the signature page of Dr. Murry's affidavit and a training certification for Julia:

> Dear Mr. Wallis:

---

[4] Dr. DiSilvestro's Affidavit, signed on March 1, 2013, was clearly not included with the initial application dated February 28, 2013.

> Per our conversation[n] on Friday and after careful review of the application submitted by Mr. Peklun to [TDM] in [M]arch 2013, we are missing some parts of the application before we can proceed to review this application.
>
> Please note that page 2 of [] the physician affidavit[] is missing for [P]aul Murry.  We did receive a page 1 and a letter but the second page needs to be notarized.  I have attached [it] here for you.  We also do not have any animal certifications that the dog is certified and trained to be a service dog.  Please have the owner provide this documentation.  This is a requirement of the application.

*       *       *

Commission Investigation at 64.  Several days later, on May 16, 2013, Wallis responded.  *See* Wallis May 16, 2013 Letter, ECF No. [44-2] at 1.  After objecting to the response period provided by the letter, Wallis advised Ms. Platti that her predecessor previously resolved the issue with Julia.  *Id.*  Nevertheless, Wallis claimed that he and Peklun were "working diligently to provide" the requested documentation, which would "be provided shortly."  *Id.*  On May 21, 2013, Wallis submitted the missing affidavit page, but failed to include the evidence of Julia's certification.  *See* Commissioner Investigation at 63; *see also* Email from Wallis dated May 21, 2013, ECF No. [44-4]. Due to Wallis' failure to include all requested documentation, Ms. Platti again requested Julia's certification.  *See* Email dated May 21, 2013, ECF No. [44-4]. On May 31, 2013, TDM denied Peklun's accommodation and informed him that he would have to remove Julia within ten (10) days.  Pls. SOF at ¶ 54.  As a basis, TDM stated that Peklun lost whatever right he had to a reasonable accommodation by keeping Julia in the unit without ever requesting an accommodation.  *Id.*; *see also* Letter from Scott R. Shapiro, ECF No. [51-25] at 1-2.  TDM cautioned Peklun that should he fail to remove Julia within the period provided, TDM would initiate arbitration against him in accord with Fla. Stat. § 718.1255.  Letter from Scott R. Shapiro, ECF No. [51-25] at 2.  Julia was never removed and, on July 16, 2013, TDM

commenced arbitration against Peklun with the Florida Division of Condominiums, Timeshares, and Mobile Homes.  Pls. SOF at ¶ 55.

Because Peklun continued to harbor Julia in his residence, Speciale made good on his earlier threat, commencing legal action to have Julia removed on October 25, 2013 (the "State Court Action").  *See generally* Plaintiff's Verified Complaint in *Frank Speciale v. Sergey Peklun et al.*, Case No. 50-2013CC013308XXSB (RS) (Cir. Ct. Palm Beach), ECF No. [51-34].  On January 17, 2014, Speciale moved for an injunction barring Peklun from keeping Julia on the premises.  *See generally* Plaintiff's Verified Motion in the State Court Action, ECF No. [57-24].  Acting on behalf of TDM, Verduce submitted an affidavit in the State Court Action, informing the presiding judge, Judge Edward Garrison, that there was no record that the Board of Directors had ever granted Peklun an accommodation.  Pls. SOF at ¶ 57; Affidavit of TDM, ECF No. [51-26] at ¶ 6.

In the State Court Action, Viktoria Peklun admitted that Julia "did not receive any training which would allow her to qualify as a 'service animal' under the definition provided in Titles II and III of the Americans with Disabilities Act (i.e., 28 C.F.R. § 35.104 and § 35.136 and 28 C.F.R. § 36.104)."  *See* Speciale's First Request for Admissions, ECF No. [57-5] at ¶ 9.  Additionally, Viktoria admitted that she possessed "no documents which reflect that Julia has ever received any training which would allow her to 'ameliorate sleep disturbance', as stated by Dr. Paul Murr[]y . . . ."  *Id.* at ¶ 10.

On March 11, 2014, Judge Garrison issued a preliminary injunction against Peklun, finding that removal of Julia was necessary pursuant to TDM's policies.  *See* Order Granting Injunction in the State Court Action, ECF No. [57-20] at 1-2.  Peklun, via counsel, sought to

dissolve the preliminary injunction.  His request was denied on June 9, 2014.  *See* Order Denying

Motion to Dissolve, ECF No. [57-16] at 1.

Meanwhile, the Palm Beach County Board of County Commissioners Office of Equal

Opportunity ("PBCOEO") organized an extensive investigation into TDM's purported

discrimination.  *See generally* Commission Investigation.  After conducting numerous interviews

and reviewing all available documentation and communications, the PBCOEO concluded the

following in a 123-page report issued on May 21, 2014:

> Peklun has a disability as defined by the fair housing laws.
> According to Peklun's doctors, he has an impairment that
> substantially limits several major life activities, including walking,
> breathing, and performing manual tasks.  He also suffers from
> depression and anxiety and his doctors are in agreement that
> Peklun needs an emotional support animal.
>
> Peklun Informed the Respondent in writing on two separate
> occasions that he was disabled and that he required an emotional
> support animal for his reasonable accommodation.  In 2011, the
> Respondent granted Peklun's request.  In 2013, the Respondent
> changed property management companies and required Peklun to
> "re-certify" for his reasonable accommodation, to which when he
> did, they ultimately denied him based on him already having the
> animal prior to making the reasonable accommodation request.
> This is clearly pretextual and the Respondent failed to follow their
> reasonable accommodation policy by requiring Peklun to apply
> through the process again and by failing to notify him in writing
> missing documentation when it was needed.   Therefore, the
> Respondent knew or should have known that Peklun has a
> disability and they were aware of his reasonable accommodation
> request to the Respondent's "No Pet" policy and for Julia to be his
> emotional support animal.   Furthermore, the Respondent cause
> unreasonable delay of Peklun's request and still denied him of a
> reasonable accommodation that they already granted him.
>
> Despite having a sufficient amount of information to grant
> Peklun's reasonable accommodation for a second time, the
> Respondent continued to request additional information, issued
> violation notices and has filed an arbitration action against Peklun.
> *Based on the foregoing, there are reasonable grounds to believe*
> *that the Respondent discriminated against the Complainant on the*

> *basis of his disability when they asked him in March 2013 to resubmit his request for a reasonable accommodation when they already granted him a reasonable accommodation for his emotional support animal Julia in 2011, and when they eventually denied the Complainant's second request based on pretextual reasoning.*

Commission Investigation at 119-20 (emphasis supplied); *see also* Palm Beach County Board of County Commissioners Office of Equal Opportunity, Notice of Determination of Reasonable Grounds, ECF No. [57-18] at 6 ("[T]here are reasonable grounds to believe that [TDM] discriminated against [Peklun] on the basis of his disability.").

On March 14, 2014, Dr. Murry issued another letter, confirming the conclusions reached in his September 9, 2011 letter, advising the reader that Peklun has obstructive sleep apnea as a result of his morbid obesity and uses a sleep apnea machine ("CPAP") to remedy the problem when sleeping. *Compare* March 14, 2014 Letter, ECF No. [57-8] at 1 *with* Letter from Dr. Murry, ECF No. [51-5] at 1 (noting that Peklun has multiple medical problems, has "been discovered to have sleep apnea syndrome," which Julia helps treat by "detect[ing] [] respiratory arrest in [Peklun] and [] stimulat[ing] arousals to [avoid] dangerous consequences"). Julia, Dr. Murry again emphasized, "has been trained to respond to the alarm systems on [the CPAP] machine and to respond to snoring induced by falling asleep while sitting . . . ." *Id.* Thus, Dr. Murry concludes that without Julia, it would be "possible and likely" for Peklun to come to "an early demise" by virtue of his obesity, sleep apnea, and other health issues. March 14, 2014 Letter, ECF No. [57-8] at 1. Thereafter, on August 11, 2014, TDM approved Peklun's request for a reasonable accommodation. *See* Corporate Resolution, ECF No. [57-19] at 1. In the resolution, Julia was classified as an emotional support animal. *Id.*

Notwithstanding the Board's renewed approval, Speciale continued to seek Julia's eviction, filing a motion in the State Court Action requesting that the court either: (a) hold

Peklun in contempt of court for violating the previously-issued injunction; or (b) strike Peklun's answer as sanctions for his "willful and contumacious disregard" of the injunction order.  *See generally* Plaintiff's Verified Motion for Entry of Order in State Court Action on December 4, 2014, ECF No. [51-33]. Two months later, Peklun took his own life, purportedly on the day he was to appear in court regarding the aforementioned contempt motion.  Pls. SOF at ¶ 64.

Based on the foregoing, Plaintiffs commenced this action alleging that Verduce and Speciale "commenced a campaign of harassment against Sergey and Viktoria Peklun [(collectively, the "Pekluns")] in order to secure the remov[al] of [] Peklun's Emotional Support Animal, Julia, and to enable [] Speciale to seek to recover damages from the Pekluns via a county court lawsuit."  *See generally* SAC at ¶¶ 24-60.  With respect to Verduce, Plaintiffs allege that she acted intentionally by, *inter alia*, refusing to acknowledge the accommodation granted to Peklun in 2011, failing to inform TDM's new management of the 2011 accommodation, casually omitting the 2011 accommodation from her affidavit submitted in the State Court Action, encouraging TDM's Board of Directors to seek Julia's removal, and generally supporting Speciale's lawsuit against the Pekluns.  *Id.* at ¶ 50.  As to Speciale, Plaintiffs believe the following conduct to be indicative of his malicious intentions: "[u]ndertaking a campaign of harassment to achieve the removal of" Julia, despite his knowledge that she was medically necessary; falsely alleging that Julia aggravated his allergies; commencing a frivolous lawsuit against the Pekluns for injunctive relief; and, neglecting to inform Judge Garrison that Peklun was granted an accommodation in 2011.  *See id.* at ¶ 51.  Plaintiffs also seek recovery under the federal and Florida Fair Housing Acts, claiming that TDM and Verduce, by virtue of her position on TDM's Board of Directors, discriminated against Peklun on the basis of his disability by: failing to record the 2011 accommodation; requiring him to "re-certify" his request for a

reasonable accommodation in 2013; initially denying his second, unnecessary request for accommodation; and by declining to engage in the interactive process of granting him a reasonable accommodation. *See id.* at ¶¶ 73-98.

## II.      STANDARD UNDER RULE 56 OF THE FEDERAL RULES

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The parties may support their positions by citation to the record, including inter alia, depositions, documents, affidavits, or declarations.  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* (quoting *Anderson*, 477 U.S. at 247-48).  The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  Further, the Court does not weigh conflicting evidence.  *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th

Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving  party's favor.  *Shiver*, 549 F.3d at 1343.  Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate.  *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

In resolving issues presented under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993))).  In particular, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, 2013 WL 5596114, at *4 (S.D. Fla. Oct.11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

## III.   DISCUSSION

TDM moves for summary judgment on Plaintiffs' FHA claims, Count IV of the Second Amended Complaint, asserting that its decision to deny Peklun's 2013 Request for Reasonable Accommodation was reasonable due to the fact that: (1) Peklun failed to provide TDM with the requested information necessary to verify his disability; and (2) Julia was not, in reality, a trained service animal.  *See generally* TDM's Motion.  Even assuming the aforementioned facts were established with respect to Peklun's 2013 Request for Reasonable Accommodation, TDM contends that Peklun was not a "qualified individual" under the FHA.  *Id.*  In response, Plaintiffs not only reject these contentions, but argue that the facts concerning TDM's inexplicable revocation of the 2011 accommodation and subsequent acts clearly evince violations of the FHA. Plaintiffs claim that the facts support their claims relating to intentional infliction of emotional distress to such a degree that they are entitled to judgment.  *See generally* Plaintiffs' Motion. The Court addresses the Motions in turn.

### A.   Plaintiffs' Claim under the Fair Housing Act (Count IV)[5]

"[D]iscrimination under the Fair Housing Act includes a refusal to make a 'reasonable accommodation' for handicapped persons."  *Loren v. Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 729-30 (1995)). Specifically, 42 U.S.C. § 3604 prohibits discrimination based on the refusal "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B); *accord* Fla. Stat. § 760.23(9)(b) (stating that discrimination under the Florida Fair Housing Act includes "[a] refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling").

"To prevail on a Section 3604(f)(3)(B) claim, a plaintiff must establish that (1) he is disabled or handicapped within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) such accommodation was necessary to afford him an opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the requested accommodation." *Hawn v. Shoreline Towers Phase 1 Condo. Ass'n, Inc.*, 347 F. App'x 464, 467 (11th Cir. 2009) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218-19 (11th Cir. 2008)).   "The FHA's reasonable accommodation provision requires only those accommodations that 'may be necessary . . . to afford equal opportunity to use and enjoy a dwelling.'"  *Schwarz*, 544 F.3d at 1226 (quoting 42 U.S.C. § 3604(f)(3)(B)) (emphasis removed).   Thus, the determination of

---

[5] Because the Florida Fair Housing Act and the Federal Fair Housing Act are, for all intents and purposes, identical, the Court considers these claims simultaneously.  *See Loren v. Sasser*, 309 F.3d 1296, 1300 n.9 (11th Cir. 2002) ("The Florida Fair Housing Act contains statutory provisions that are substantively identical to the federal Fair Housing Act, and the facts and circumstances that comprise the federal and state fair housing claims are the same.").

whether a particular accommodation is reasonable involves a very fact-specific inquiry and necessitates an examination of the particular circumstances. *Loren*, 309 F.3d at 1302 ("Whether a requested accommodation is required by law is highly fact-specific, requiring case-by-case determination.") (internal citation and quotation omitted); *see also Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) ("Whether an accommodation [under the ADA] is reasonable depends on specific circumstances.") (citation omitted). "Under the Fair Housing Act, plaintiffs have the burden of proving that a proposed accommodation is reasonable." *Loren*, 309 F.3d at 1302 (citation omitted). Moreover, a defendant will not be liable for denying a reasonable and necessary accommodation when it "never knew the accommodation was in fact necessary," meaning the defendant "must know or reasonably be expected to know of the existence of *both* the handicap and the necessity of the accommodation." *Hawn*, 347 F. App'x at 467 (citing *Schwarz*, 544 F.3d at 1219; *DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006)) (emphasis added). In evaluating reasonable accommodation claims under the FHA, courts may look to case law under the Rehabilitation Act and the Americans with Disabilities Act ("ADA") for guidance. *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 876 (11th Cir. 2011) (citing *Schwarz*, 544 F.3d at 1220).

### i.     Whether Peklun was "Handicapped"

Logically, the first argument that must be considered is whether Peklun is handicapped as the term is used in the FHA. If Peklun was not "disabled or handicapped within the meaning of the FHA," all other arguments are irrelevant as the first element of Plaintiffs' FHA claim remains unsatisfied. *See Hawn*, 347 F. App'x at 467. According to TDM, Peklun does not qualify.

"An individual is handicapped, for the purposes of the Fair Housing Act, if he has (a) 'a physical or mental impairment which substantially limits one or more of such person's major life

activities,' (b) 'a record of such impairment,' or (c) is 'regarded as having such an impairment.'"

*Hawn*, 347 F. App'x at 467 (citing 42 U.S.C. § 3602(h)).  The parties highlight the first method

and present no arguments as to the other two.  The Court tailors its discussion accordingly.[6]

Plaintiffs allege that Peklun was disabled within the meaning of the FHA because he

suffered from "heart disease, kidney disease, lung disease, sleep apnea, anxiety and depression."

*See* SAC at ¶ 77.  TDM asserts that these impairments cannot be considered a disability under

either the FHA or the ADA.  For all intents and purposes, the terms "handicap" and "disability"

have the same legal meaning: "the definition of disability in the [ADA] 'is drawn almost

verbatim' from the definition of handicap 'contained in the [FHA]." *Sabal Palm Condominiums*

*of Pine Island Ridge Ass'n, Inc. v. Fischer*, 6 F. Supp. 3d 1272, 1276 n.4 (S.D. Fla. 2014)

(quoting *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)) (emphasis omitted) ("Congress'

repetition of a well-established term [implies] that Congress intended the term to be construed in

accordance with pre-existing regulatory interpretations.").

Courts in this Circuit have found that merely noting the existence of a physical ailment,

such as heart disease, without more, does not constitute a disability within the meaning of the

---

[6] Plaintiffs' do not explicitly argue under any prong. However, in response to TDM's Motion, Plaintiffs cite exclusively to cases involving the establishment of a disability by evidence that the purported disability interferes with a person's major life activities.  *See* Plaintiffs' Motion, ECF No. [51] at 17 (noting that Peklun's sleep apnea "poses a risk of respiratory arrest while [he] is asleep"). The distinction is ultimately of little consequence as "the record-of-impairment standard is satisfied only if [the plaintiff] actually suffered a physical impairment that substantially limited one or more of her major life activities."  *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999) (citing 29 C.F.R. pt. 1630, App. § 1630.2(k) (1997); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 645 (2d Cir. 1998); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510 n. 7 (7th Cir. 1998); *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1120-21 (5th Cir. 1998)) ("The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities.").  Therefore, the prescient inquiry in either context concerns the effect the particular condition has on major life activities.

applicable statute. In *Hilburn v. Murata Electronics of N. America, Inc.*, 181 F.3d 1220 (11th Cir. 1999), the plaintiff claimed to be disabled under the ADA by virtue of coronary heart disease, arguing that it substantially limited her performance of the major life activities of "running, performing manual tasks, lifting, and working." *Id.* at 1227.  Notwithstanding the Equal Employment Opportunity Commission's regulation including heart disease in a list of physical impairments, the Eleventh Circuit concluded that the plaintiff had not demonstrated that her heart disease had substantially limited any major life activities. *See id.* at 1227-28 (citing 45 C.F.R. pt. 84, App. A., subpart (A)(3) (1997)).  Although the plaintiff had submitted the affidavit of her physician, which advised that the plaintiff had a "diminished activity tolerance for . . . running," the Court found that the affidavit was conclusory and otherwise "insufficient to create a genuine issue of material fact." *Id.*  Thus, the plaintiff failed to establish by adequate evidence that her heart disease impaired a major life function such as running and the Eleventh Circuit affirmed the trial court's decision to grant summary judgment in favor of the defendant. *Id.*

Like the submitted evidence in *Hilburn*, the affidavits of Peklun's treating physicians do little, if anything, to elucidate how Peklun's heart disease substantially limits a major life activity.  Dr. Murry's various submissions including his September 9, 2011 affidavit and March 14, 2014 letter make only casual reference to Peklun's heart disease.  *See* September 9, 2011, Letter from Dr. Murry, ECF No. [51-5] at 1 (noting that Peklun is "being seen on a regular basis by a cardiologist . . ."); March 14, 2014 Letter, ECF No. [57-8] at 1 (stating that Peklun has "a severe hypertensive condition which has been shown to be causing severe end-organ damage like sever kidney dysfunction . . . and heart disease" and noting that he takes "supportive medications" prescribed by his doctor).  Absolutely no attempt is made to tie this impairment to the inhibition of a major life activity.  "[C]onclusory allegations without specific supporting facts

have no probative value." *Hilburn*, 181 F.3d at 1227-28 (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)) (finding that affidavit which was "devoid of any specific facts whatsoever which support the conclusion that [the plaintiff's]" claimed affected life functions were substantially limited).   Similarly, Dr. DiSilvestro's submissions nonchalantly reference Peklun's cardiac issues, and, like Dr. Murry's correspondence, also fail to address how such impairments inhibit any major life functions.   For instance, Dr. DiSilvestro simply notes that Peklun has "cardiac disease which predisposes him to anxiety and depression" and has "limited function[ing] capacity from [a] cardiac and pulmonary standpoint." *See* Commission Investigation at 29 (May 12, 2011 Letter from Dr. DiSilvestro); Affidavit of Treating Physician dated March 1, 2013, ECF No. [51-15] at 1.   No supportive facts are provided to buttress the vague and conclusory assertion that Peklun has "limited function[ing] capacity from [a] cardiac . . . standpoint." *See Reis v. Universal City Dev. Partners, Ltd.*, 442 F. Supp. 2d 1238, 1244 (M.D. Fla. 2006) ("Clarity is important when defining a physical impairment [under the ADA] because the determination of whether Plaintiff is substantially limited in a major life activity is determined by examining the facts and circumstances surrounding her *particular* impairment." (emphasis in original)) (citation omitted). Accordingly, Plaintiffs have failed to demonstrate that Peklun's cardiac issues substantially limited a major life activity.[7]

Based on the record presented, Peklun's other medical conditions, namely his kidney disease, lung disease, anxiety, and depression also do not support a finding that he was disabled under the FHA.   Again, the record contains only ambiguous references to these medical issues. Dr. Murry states that Peklun has "kidney dysfunction . . . [which] causes fluid accumulation."

---

[7] In fact, Plaintiffs do not seek to rebut TDM's contention in this respect, instead opting to focus exclusively on whether sleep apnea is a qualifying disability and whether Julia can be considered an emotional support animal.  *See* Plaintiffs' Motion, ECF No. [51] at 12-20.

*See* March 14, 2014 Letter, ECF No. [57-8] at 1.  References to Peklun's anxiety and depression are made without so much as a modicum of information as to how these afflictions affect Peklun's daily life.[8]  While these conditions are undoubtedly unfortunate, the Court is left wondering in what respect they inhibited Peklun's major life functions.  Indeed, Plaintiffs elect not to contest TDM's assertions in this regard.  *See supra* note 7.

This leaves Peklun's sleep apnea as the only disability upon which a finding that he was handicapped under the FHA may be based.  Once again, TDM asserts that sleep apnea is not a qualifying handicap under the facts presented.  The Court disagrees.

The submissions of Peklun's treating physicians are sufficient to establish that Peklun's sleep apnea interfered with a major life activity.  In 2011, Dr. Murry clearly noted that, as a result of Peklun's sleep apnea, "there is the danger of respiratory arrest and respiratory failure" and, "[f]or this reason, he requires 24 [hour] monitoring."  Letter from Dr. Murry, ECF No. [51-5] at 1.  In 2013, Dr. Murry again noted the danger Peklun's sleep apnea posed, informing TDM that Peklun's issue was not only "chronic," but also caused Peklun to have difficulty ambulating.  *See* Affidavit and February 28, 2013 Dr. Murry Letter, ECF No. [44-9] at 1-2.  Finally, in 2014, Dr. Murry noted that Peklun suffered from "excessive day-time drowsiness."  *See* March 14, 2014 Letter, ECF No. [57-8] at 1.  "In determining whether a disability qualifies as a substantial limitation of a major life activity, courts are to consider: '(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment.'"  *Mont-Ros v. City of W. Miami*, 111 F. Supp. 2d 1338, 1351 (S.D. Fla. 2000)

---

[8] The record is devoid of medical evidence that Peklun was being treated for depression and anxiety.  The only mention of such conditions is in Dr. DiSilvestro's letter which indicates that Peklun's other health conditions "predisposes him to anxiety and depression."  *See* Commission Investigation at 29 (May 12, 2011 Letter from Dr. DiSilvestro).

(quoting *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996)).  Major

life activities include "functions such as caring for oneself, performing manual tasks, walking,

seeing, hearing, speaking, breathing, learning, and working," as well as sleeping. *Gordon*, 100

F.3d at 911 (quoting 29 C.F.R. § 1630.2(i)); *Mont-Ros*, 111 F. Supp. 2d at 1354-55 (citing *Pack*

*v. Kmart Corp.*, 166 F.3d 1300 (10th Cir. 1999); *Knorr v. Pepsico Food Servs., Inc.*, No. 97-CV-

1819 (NPM), 1999 WL 200685 (N.D.N.Y. Apr. 8, 1999)). The above-cited evidence, at a

minimum, allows for the conclusion that Peklun's sleep apnea was chronic and severe, affecting

the major life activities of walking and sleeping.  These inferences support a finding that Peklun

was handicapped as the term is used in the FHA.

TDM relies heavily on the case *Mont-Ros v. City of West Miami*, 111 F. Supp. 2d 1338

(S.D. Fla. 2000) to establish that Peklun's sleep apnea cannot serve to bring him within the

purview of the FHA.  In *Mont-Ros*, a police officer sued under the ADA asserting that he was

discriminated against on the basis of his disability, obstructive sleep apnea.  *See id.* at 1346-48.

Noting that "[a] physical condition, however, does not automatically qualify as a 'disability'

simply because it is documented in a medical study, diagnosed by a doctor, or capable of being

medically treated," the Court rejected the plaintiff's conclusion that his sleep apnea "was an

impairment of a severe, extended duration, or involved a [s]ubstantial permanent impact."  *Id.* at

1356 (citation and quotation omitted).  The Court also emphasized that the plaintiff's "sleep

apnea condition is treatable and can be corrected."  *Id.* at 1356.  For instance, the plaintiff's

treating physician noted that his condition was "directly related to his obesity" and, therefore,

could be alleviated with a weight reduction program.  *Id.*  Additionally, "the use of a CPAP

machine at night" would mitigate the condition during the sleeping hours thereby reducing any

daytime drowsiness.  *Id.*  Accordingly, the Court concluded that the plaintiff had failed to

"demonstrate that he is 'substantially limited in a major life activity,'" as required by the ADA. *Id.* at 1356-57.

According to TDM, Peklun's condition is nearly identical because it is ameliorated by the use of a CPAP machine and is causally affiliated with his morbid obesity.  Yet, *Mont-Ros* is factually distinguishable.  The conclusion reached therein was predicated upon a dearth of evidence.  *See id.* at 1356.  The Court specifically noted that the plaintiff "ha[d] failed to offer any evidence to demonstrate that his alleged condition was an impairment of a severe, extended duration, or involved a [s]ubstantial permanent impact." *Id.*  Although Peklun's condition may have been susceptible to treatment, like the plaintiff in *Mont-Ros*, it has, nevertheless, been demonstrated that the condition was both severe and of extended duration, requiring Peklun be monitored around the clock.  In contrast, the plaintiff in *Mont-Ros* failed to proffer "any evidence that he was incapacitated in any manner-either at work or in his daily activities-since his diagnosis of sleep apnea." *Id.*  Reaching an alternative conclusion would necessitate discounting the established severity and effect of Peklun's affliction, in other words, the drawing of an inference against Plaintiffs. The record evidence of this case, albeit sparse, is adequate to determine that Peklun's sleep apnea, notwithstanding treatment via the use of a CPAP machine, inhibited the major life activities of breathing and/or sleeping.[9]  Accordingly, there is sufficient

---

[9] In fact, the ADA, as amended, now states that the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures . . . ."  *Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488, 494 (6th Cir. 2008) (quoting 5 Pub.L. No. 110-325, § 3(4)(E)(i)).  No corresponding language exists in the FHA, and one court in this Circuit has rejected the contention that amendments made under the ADA should act to expand the FHA.  *See Ajit Bhogaita v. Altamonte Heights Condo. Assn., Inc.*, No. 6:11-CV-1637-ORL, 2012 WL 6562766, at *5 (M.D. Fla. Dec. 17, 2012) *aff'd sub nom. Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277 (11th Cir. 2014) (declining to apply ADA Amendments Act of 2008 amendments expanding scope of ADA protections to FHA and noting that "important differences [exist] among these statutes . . ., the ADA and the [Rehabilitation Act] may be broader than the FHA" (quoting *Schwarz*, 544 F.3d at

evidence to deem Peklun handicapped within the meaning of the FHA.  Plaintiffs satisfy the first element of their § 3604(f)(3)(B) claim.

### ii.       The Denial of the 2013 Accommodation Request

TDM next asserts that it cannot be held liable for the denial of the 2013 accommodation request because Peklun failed to provide adequate information regarding his disability, as well as the requisite paperwork establishing that Julia was, in fact, a trained and certified service animal, as he and his doctors had previously stated.  TDM argues that it cannot be held accountable for denying a reasonable and necessary accommodation when it "never knew the accommodation was in fact necessary."  *Hawn*, 347 F. App'x at 467 (citing *Schwarz*, 544 F.3d at 1219).  Thus, before TDM can be subject to liability under the FHA, TDM must have been informed of, or "reasonably [] expected to know of[,] the existence of *both* the handicap and the necessity of the accommodation."  *Id.* (citing *DuBois*, 453 F.3d at 1179) (emphasis added).

TDM's first contention is belied by the Court's conclusion in the preceding section.  The submissions of Peklun's treating physicians, particularly those of Dr. Murry, alerted TDM to the existence of Peklun's handicap.  In fact, the additional documentation TDM requested was not directed at discovering the true nature of Peklun's disability.  Instead, the substance of TDM's request concerned whether Julia was properly certified as a service animal.  *See* Commission Investigation at 64 (including May 13, 2013 letter from Ms. Platti to Wallis requiring Wallis to submit Julia's certifications).  Accordingly, the Court can quickly conclude that TDM was aware of Peklun's disability and move to the more salient inquiry concerning whether TDM was fully apprised of the necessity of the accommodation.

---

1212))).  This Court expresses no opinion on the issue, but simply notes that there remains a question as to whether the FHA has been similarly expanded in light of the ongoing interplay between the two statutes.

Relying on *Hawn v. Shoreline Towers Phase 1 Condo. Ass'n, Inc.*, 347 F. App'x 464 (11th Cir. 2009), TDM asserts that Peklun's failure to provide Julia's certification dooms Plaintiffs' FHA claim.  In *Hawn*, the plaintiff purchased a condominium unit which was subject to a "no pets policy."  *Id.* at 465.  In contravention to this restriction, the plaintiff obtained a puppy.  *Id.*  Seeking to have the condo association reconsider its pet policy, the plaintiff wrote the association in January 2005, informing them that the animal was a "companion," but never referring to it as a service animal.  *Id.*  Almost a year later, on in June 2006, the plaintiff claimed to have suffered from physical and psychiatric disabilities and, as a result, "[could] never feel safe alone."  *Id.* at 465-66.  This letter also discussed her companion, noting that he was a "service animal . . . dually trained to help [him] both physically and psychological," and requested an exemption from the association's no pets policy.  *Id.*  Thereafter, the association requested additional information in order to consider the request.  *Id.* at 466.  The plaintiff elected not to respond to the association's request for additional information and, thereafter, the association denied the accommodation.  *Id.*  The association persisted, once again asking the plaintiff for the specific supporting documentation.  *Id.*  Again, the plaintiff failed to respond.  *Id.*  Instead, the plaintiff filed a complaint with the Florida Commission on Human Relations ("FCHR").  *Id.*  After an investigation, the FCHR concluded that there was reason to believe that the association had discriminated against the plaintiff by refusing to reasonably accommodate his disability.  *Id.*  The plaintiff then filed an action in the Northern District of Florida, alleging, *inter alia*, violations of the Federal and Florida Fair Housing Acts.  *Id.*

The district court granted summary judgment on all claims.  *See id.*  Even when assuming that the plaintiff was disabled within the meaning of the FHA, the district court found that the plaintiff had failed to provide sufficient evidence to establish the following facts, among others:

(1) that the association "knew or should have known of the disability"; and (2) that the "requested accommodation was necessary to afford [the plaintiff] equal opportunity to use and enjoy his dwelling." *Id.* The Eleventh Circuit affirmed, noting that "[t]he duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made"; instead, the association must have "the ability to conduct a meaningful review of the requested accommodation." *Id.* at 468. Because the plaintiff's correspondence "included unclear explanations . . . and was wholly inconsistent with the reasons he provided in [other correspondence] for wanting [the animal] in his condominium unit," the plaintiff's "refusal to comply with subsequent requests for reasonable documentation prevented [the association] from conducting a meaningful review of [his] application." *Id.* Consequently, the association "could not have actually known of [the plaintiff's] disability and the necessity of the service animal." *Id.*

Akin to *Hawn*, Peklun failed to provide TDM with the requested documentation in 2013. Based on this fact alone, TDM believes it is entitled to judgment on Plaintiffs' claim under the FHA. In response, Plaintiffs implores the Court to look at the broader picture, specifically, that TDM's request that Peklun re-submit his application amounted to an arbitrary revocation of the previously granted accommodation. While this claimed "arbitrary revocation" of a previously afforded accommodation may cause the Court to question the legitimacy of that action, that is not what happened here. The undisputed record evidence reveals that in early 2013, under threat of litigation from Speciale and in light of the fact that no record of Peklun's previous accommodation existed, TDM undertook steps to confirm Julia's medical necessity. *See* Email Chain, ECF No. [51-10] at 1-5 (noting that TDM could not locate the original application, and that given Speciale's express threats of litigation and dissatisfaction with TDM's original

explanation, TDM needed to "re-confirm that [Peklun] needs this medically necessary dog"). Thus, the denial of the 2013 Request was not, as Plaintiffs suggest, an abrupt revocation of Peklun's 2011 accommodation.

Plaintiffs direct the Court to no authority indicating that it was improper for TDM to require confirmation of Julia's necessity.  Plaintiffs rely exclusively on the case of *Alley v. Les Chateaux Condo. Ass'n, Inc.*, No. 8:10-CV-760-T-33TGW, 2010 WL 4739508 (M.D. Fla. Nov. 16, 2010) for their proposition that TDM's subsequent request for additional information was violative of the FHA, yet, *Alley* is inapposite.

The plaintiff in *Alley*, a disabled individual, obtained a golf cart to increase her mobility. *Id.* at *1.  In 2004, prior to moving in to her condominium unit, the plaintiff obtained permission to use her cart on the premises.  *Id.*  For four years, the plaintiff used her golf cart without incident.  *Id.*  In 2008, the plaintiff received a letter from the newly-elected head of the condominium association requesting updated medical documentation and threatening removal of the cart if the plaintiff failed to comply.  *Id.*  The plaintiff provided the requested medical report but the association never responded, thereby effectively denying her request.  *Id.* at *1-2.  Ruling on the motion to dismiss, the Court found that the association's decision to not respond to the plaintiff's supplemental documentation amounted to an effective denial of her request for an accommodation, thereby satisfying the fourth element of a claim under 42. U.S.C. § 3604(f)(3)(B).  *Id.* at *3-4.  Thus, the question before the Court was not whether the request for additional documentation presented a violation of the FHA but, rather, whether the association had denied her request for an accommodation when it failed to respond to the documentation and opted to continue its campaign of threats and harassment.  The Court is unable to locate any authority that categorically precludes a housing association from requesting additional

documentation supporting the request for an accommodation, especially where there exists a substantial temporal disparity between the initial application and the requested update. However, the Court is not inclined to make such a sweeping proclamation that such actions are always justifiable.

Countless scenarios can be envisioned where a reasonable accommodation is granted on the basis of a disability or handicap which is later eliminated through medicine, treatment, surgery, or other means. This is most easily illustrated by way of hypothetical. An individual may require the use of a mobility scooter because she has suffered an unfortunate injury which has frustrated her ability to use her legs. She requests a reasonable accommodation in light of her handicap and the governing association grants the request. With treatment and time, her mobility returns to her, and with her progress, her handicap, as well as the necessity of the scooter, dissipates. A conclusion contrary to the one reached above would preclude the governing association from inquiring as to the continuing need for the accommodation. No provision of the FHA purports to make a granted accommodation eternal. To the extent Plaintiffs wish the Court to adopt this seemingly illogical rule, they have floundered on their obligation to inform the Court of the pertinent law. Consequently, TDM's request that Peklun re-submit an application to verify whether Julia was necessary does not, in and of itself, yield a question as to whether an FHA violation occurred.

Having determined that TDM did not err by requesting that Peklun resubmit information regarding Julia's necessity, the Court now turns to whether the facts surrounding Peklun's application, as well as TDM's response and ultimate denial of the request, creates a triable issue of fact under the FHA. The Court is once again drawn to the case of *Hawn v. Shoreline Towers Phase 1 Condo. Ass'n, Inc.*, 347 F. App'x 464 (11th Cir. 2009), which provides guidance on the

issue of whether TDM was within the ambit of its rights when it requested that Peklun re-submit his application.

The Court in *Hawn* found that "[t]he duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made." *Id.* at 468.   An association must have "the ability to conduct a meaningful review of the requested accommodation," before it can be held accountable for denying the request.   *See id.* The record indicates that Peklun failed to provide TDM with the requested documentation with respect to his 2013 accommodation request.   Notwithstanding the fact that the previous accommodation was granted for an "emotional support animal,"[10] Peklun and his treating physician represented, unequivocally, that Julia was also a service animal who was trained *and certified* to assist Peklun in the treatment of his sleep apnea by detecting respiratory arrest and offering stimulation to prevent the natural consequences thereof.   *See* September 9, 2011, Letter from Dr. Murry, ECF No. [51-5] at 1 ("His pet dog has been trained to detect . . . respiratory arrest in him and to stimulate arousals to pre[v]ent dangerous consequences.   His pet is identified as a certified act guideline.   Please allow this service animal to reside on your premises . . . ."); February 28, 2013 Murry Letter, ECF No. [44-9] at 1-2 (stating that Julia is "trained to facilitate patient's night-time breathing" and again reiterating that Julia is a "certified service animal" who has "been trained to detect respiratory arrest . . . and to stimulate arousal to pre[v]ent dangerous consequences"). Based on these representations, TDM was free to request documentation and information supporting these claims in order to conduct a meaningful review.   As noted by another court in this Circuit, "a housing provider may request reliable disability-related

---

[10] The record indicates that the 2011 accommodation was based on Julia's use as an emotional support animal.   *See* Aff. of Wendy Casey, ECF No. [51-27] at ¶ 7; Aff. of Bert Howard, ECF No. [51-28] at ¶ 5; Aff. of Alex Curcio, ECF No. [51-29] at ¶ 4; Aff. of Ronnie Barker, ECF No. [51-30] at ¶ 5.

information that (1) is necessary to verify that the person meets the Act's definition of disability . . ., (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation." *Ajit Bhogaita v. Altamonte Heights Condo. Assn., Inc.*, No. 6:11-CV-1637-ORL, 2012 WL 6562766, at *6 (M.D. Fla. Dec. 17, 2012) *aff'd sub nom. Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277 (11th Cir. 2014) (quoting *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621-22 (6th Cir. 2011)). The permissibility of such requests was also acknowledged by the lower court in *Hawn*: "[I]t is reasonable to require the opinion of a physician who is knowledgeable about the subject disability and the manner in which a service dog can ameliorate the effects of the disability." *Hawn v. Shoreline Towers Phase I Condominium Ass'n, Inc.*, No. 3:07–cv–97/RV/EMT, 2009 WL 691378 at * 7 (N.D. Fla. 2009), *aff'd* 347 F. App'x 464 (11th Cir. 2009) (quoting *Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245 (D. Haw. 2003) *aff'd sub nom. DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175 (9th Cir. 2006)). And while "detailed information about the nature of a person's disability is not necessary," *Overlook*, 415 F. App'x at 621-22, an association is certainly reasonable in requesting documentation explicitly relied upon in the individual's request for accommodation. *See, e.g., In re Kenna Homes Co-op. Corp.*, 210 W. Va. 380, 391 (2001) ("[I]t is not unreasonable to require proof of proper training in the form of a written assertion by the dog's trainer that the dog has been trained to perform specific tasks.").

In response to Ms. Platti's May 13, 2013 correspondence, Wallis stated that he and Peklun were "working diligently to provide" the requested documentation. Wallis May 16, 2013 Letter, ECF No. [44-2] at 1. Eight days later, Wallis submitted one of the requested documents, but not Julia's purported certification. *See* Commissioner Investigation at 63; *see also* Email

from Wallis dated May 21, 2013, ECF No. [44-4]. Ms. Platti again requested the documentation Dr. Murry claimed to have relied upon. *See* Email dated May 21, 2013, ECF No. [44-4]. Ten days passed and neither Wallis nor Peklun submitted the requested documents. On May 31, 2013, Peklun's request was denied. Pls. SOF at ¶ 54. Peklun's failure to provide the information after not one, but two requests, *likely* "prevented [TDM] from conducting a meaningful review of [Peklun's] application and thereby [TDM] [*likely*] could not have actually known of . . . the necessity of a service animal." *Hawn*, 347 F. App'x at 468. A question arises, however, when recognizing the context of the particular denial.

More likely than not, the Pekluns were not in possession of any certification that would serve as evidence of Julia's training and, further, Julia seemingly lacked any training whatsoever. *See* Speciale's First Request for Admissions, ECF No. [57-5] at ¶¶ 9-10 (containing Viktoria Peklun's admission that Julia "did not receive any training which would allow her to qualify as a 'service animal'" under the ADA, and that she did not possess "documents which reflect that Julia has ever received any training which would allow her to 'ameliorate sleep disturbance', as stated by Dr. Paul Murr[]y . . ."). Although not defined by the FHA or the accompanying regulations, the term "service animal" is "understood for purposes of the [ADA] to include 'any guide dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability . . . .'" *Prindable*, 304 F. Supp. 2d at 1256 (quoting 28 C.F.R. § 36.104 (2002)). Thus, no statute or regulation requires an individual to obtain certification for their pet in order for that pet to be considered a service animal (although it would be hearty evidence of the pet's training). Nevertheless, the absence of any certification or training did not permit TDM to immediately deny the request without further inquiry given that Peklun was previously granted an accommodation for Julia on the basis that she was an "emotional support

animal" in 2011.   According to TDM's prior Board of Directors, after reviewing pertinent medical documentation and interviewing Peklun's physician, the board accommodated Julia as an "emotional support animal."   *See* Aff. of Wendy Casey, ECF No. [51-27] at ¶¶ 4-7; Aff. of Bert Howard, ECF No. [51-28] at ¶¶ 3-5; Aff. of Alex Curcio, ECF No. [51-29] at ¶¶ 3-4; Aff. of Ronnie Barker, ECF No. [51-30] at ¶¶ 4-5.   Naturally, Dr. Murry and Peklun's more recent representation that Julia was now to be considered a "service animal" prompted some confusion. In contrast to a "service animal," an "emotional support animal" does not require "task specific training."   *See Warren v. Delvista Towers Condo. Ass'n, Inc.*, 49 F. Supp. 3d 1082, 1086-87 (S.D. Fla. 2014) (citing *Sabal Palm Condos. of Pine Island Ridge Ass'n, Inc. v. Fischer*, 6 F. Supp. 3d 1272, 1281 (S.D. Fla. 2014); Pet Ownership for the Elderly and Persons With Disabilities, 73 FR 63834–001) (reviewing FHA regulations and concluding that "[t]he HUD rulings and notices make clear that an emotional support animal need not be specifically trained because the symptoms the animal ameliorates are mental and emotional, rather than physical"). Both types of animals qualify for a reasonable accommodation under the FHA.   *See id.*   With respect to Peklun's 2013 Request, Dr. DiSilvestro indicated that Julia was *both* an emotional support animal and a service animal.   *See* Affidavit of Treating Physician dated March 1, 2013, ECF No. [51-15] at 1.   Because knowledge of the 2011 accommodation based on Julia being an "emotional support animal" was imputed to TDM's current board and also brought to its attention again in 2013, it had an obligation to open a dialogue regarding Julia's purpose before denying the request, especially given the mildly conflicting reports. *Jankowski Lee & Associates v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996), *as amended* (Aug. 26, 1996) ("If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue.").

*Hawn* does not mandate that the Court find TDM's 2013 denial to be reasonable as a matter of law; the case is slightly, but critically distinguishable on this point.  In *Hawn*, the plaintiff provided "wholly inconsistent" reasons for the requested accommodation and the plaintiff's refusal to provide the documentation necessary to investigate this conflict was not provided.  *See* 347 F. App'x at 468.  Here, there was, admittedly, a soft conflict between the 2011 accommodation and the 2013 Request, and TDM was reasonable in requesting supplemental information regarding Julia's training.  The issue of fact arises due to TDM's exclusive reliance on the lack of certification and its failure to exert any effort to investigate the status of the alternative possibility: that Julia was still required as an emotional support animal.  Julia may have served Peklun as both an emotional support animal as well as a service animal; the two bases are not mutually exclusive.  For this reason, summary judgment on Count IV must be denied.

### iii.    *TDM's Arguments Made in Response to Plaintiffs' Motion*

TDM has submitted an omnibus memorandum which replies to Plaintiffs' Response in Opposition to TDM's Motion and, also, responds to Plaintiffs' Cross-Motion.  *See generally* TDM's Response, ECF No. [57]. The memorandum is rife with additional assertions and new arguments not raised in its original Motion.  Nor do the additional arguments address issues raised by Plaintiffs' Cross-Motion.  *See generally id.*  For example, TDM asserts that because Julia posed a direct threat to the health of Speciale, the 2013 denial was reasonable pursuant to 42 U.S.C. § 3604(9).  *See* TDM's Response, ECF No. [57] at 12-15.  This statutory argument appears nowhere in TDM's Motion and, therefore, this argument, and all other newly-advanced arguments are improper.  *Preferred Care Partners Holding Corp. v. Humana, Inc.*, No. 08-20424-CIV, 2008 WL 4500258, at *2 (S.D. Fla. Oct. 3, 2008) ("To the extent that Defendant has

raised made new arguments—other than those that specifically address points made by Plaintiff in its Response—the Court will ignore such arguments.").   Nevertheless, the Court briefly entertains them.

Section 3604(9) states that "[n]othing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others."  42 U.S.C. § 3604(9).  Consideration of the competing interests of the accommodation and the health and safety of others should include an examination of, among other things, whether the threat to the health and safety of others "cannot be reduced or eliminated by another reasonable accommodation." *Warren*, 49 F. Supp. 3d at 1087 (citing U.S. Dep't of Hous. and Urban Dev., *Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-funded Programs*).  However, "determining whether [an animal] poses a direct threat that cannot be mitigated by another reasonable accommodation is not a question of law, it is distinctly a question of fact." *Id.*  The record concerning Speciale's allergies and the effect on Julia is contentious and the Court declines to grant judgment based on a hotly debated factual dispute.  Whether Julia's effect on Speciale could have been ameliorated through the adoption of other accommodations has yet to be demonstrated.

Next, TDM argues that it was reasonable in denying the accommodation because Judge Garrison denied Peklun's motion to dissolve the preliminary injunction issued in the State Court Action, thereby ratifying TDM's decision to deny the accommodation.  While this Court does not seek to disturb Judge Garrison's independent determination, this Court is not bound by the same judicial findings.  First, the question before Judge Garrison was not whether the denial of the accommodation presented a triable claim under the FHA.  Second, it appears that Judge

Garrison was not informed of the accommodation that TDM afforded Peklun in 2011.  *See* Order Granting Injunction in the State Court Action, ECF No. [57-20] at 1-2 (noting that Peklun maintains a canine in their unit "without the approval of the Board of Directors of [TDM]").  His calculus may have been different had that judge been afforded the benefit of the complete record this Court now has before it.  Consequently, the Court will not treat Judge Garrison's decision as a ratification of the legality of TDM's actions as they are considered in the context of the FHA.

TDM's final argument is without merit and requires little, if any, consideration.  TDM argues that Plaintiffs cannot pursue their claim under § 3604.  TDM's Response, ECF No. [57] at 17-20.  According to TDM, § 3604 "applies only to discrimination related to the acquisition or sale and rental of housing."  *Id.* at 17.  In support, TDM cites *Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, Inc.*, 276 F. Supp. 2d 1222 (M.D. Fla. 2003), *vacated* No. 8:02CV1955T30TGW, 2003 WL 22149660 (M.D. Fla. Sept. 16, 2003).  *Gourlay*'s reasoning is wholly inapplicable to the instant action as the Middle District of Florida was faced with interpreting a subsection of § 3604 not implicated herein.[11]  *See id.* at 1229-30.  The court in *Gourlay* determined that § 3604(a) applied exclusively to "discriminatory conduct that directly impacts a plaintiff's ability to locate in an area or obtain housing and *not* conduct that just allegedly interferes with the use or enjoyment of a dwelling *after* that dwelling is purchased."  *Id.* (emphasis added).  Plaintiffs bring their action under § 3604(f), which prohibits individuals from discriminating "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap."   42 U.S.C.  § 3604(f)(1).  Conduct qualifying as discrimination in this context includes "a refusal to make reasonable accommodations in rules,

---

[11] TDM's other cited authority also discusses subsections of § 3604 not relevant here.  *See, e.g.,* *Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F. Supp. 2d 1133 (S.D. Fla. 2004) (discussing § 3604(a) and (b)) (additional citations omitted).

policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* at § 3604(f)(3)(B). Subsection (f) clearly applies to the circumstances of this case and consideration of TDM's assertion that Plaintiffs' cannot maintain an action under 42 U.S.C. § 3604 is unwarranted.[12]

**B.      Defendant Verduce Inappropriately Seeks Affirmative Relief in Response**

Defendant Verduce asserts that she cannot be individually liable for the actions of TDM. *See* Verduce's Response, ECF No. [60] at 18-25. This request is inappropriate as a party may not seek affirmative relief in response. *See Anderson v. Branch Banking & Trust Co.*, No. 13-CIV-62381, 2015 WL 4554921, at *17 (S.D. Fla. July 28, 2015) ("It is not appropriate to seek an order for affirmative relief in a response to a motion." (quoting *Silver v. Karp*, No. 14–80447–CIV, 2014 WL 4248227, at *5 n. 3 (S.D. Fla. Aug. 27, 2014))); *see also CompRehab Wellness Grp., Inc. v. Sebelius*, No. 11–23377–CIV, 2013 WL 1827675, at *7 (S.D. Fla. Apr. 30, 2013) (citing Fed. R. Civ. P. 7) (noting that "a response to a motion is not a motion").

**C.      Plaintiffs' Motion fails to assert a Sufficient Basis for Judgment on the Remaining Claims (Counts I through III)**

Although Plaintiffs move for summary judgment, they make no argument concerning their entitlement to judgment as a matter of law. Instead, at the conclusion of their Motion, Plaintiffs' state, in a conclusory fashion, that the facts are "so one-sided that one party must prevail as a matter of law." Plaintiffs' Motion, ECF No. [51] at 19 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). At no point does Plaintiffs' Motion address the

---

[12] TDM also believes that it should be insulated from the conduct of Verduce and Speciale, claiming that an association is not always liable for the actions of its directors. While this may be true, TDM fails to present relevant authority involving actions under § 3604 and, accordingly, has not adequately supported this point. The case of *Hous. Opportunities Project For Excellence, Inc. v. Key Colony No. 4 Condo. Assoc., Inc.*, 510 F. Supp. 2d 1003 (S.D. Fla. 2007) merely stands for the proposition that individual board members may be held individually liable under the FHA, not vice versa. *See id.* at 1013-14.

15-CIV-80801-BLOOM/VALLE

remaining claims against Verduce and Speciale, specifically, those relating to intentional infliction of emotional distress (Counts I through III).  Accordingly, Plaintiffs fail to satisfy their initial burden on summary judgment of demonstrating that there is no genuine dispute as to any material fact. As such, their Motion must be denied.  *See* Fed. R. Civ. P. 56(a).

**IV.     CONCLUSION**

Based on the record presented, summary judgment is improper.  It is, therefore, **ORDERED AND ADJUDGED** that

1.      Defendant Tierra Del Mar Condominium Association, Inc.'s Motion for Summary Judgment, **ECF No. [44]**, is **DENIED.**

2.      Plaintiffs, Alexander Peklun, as Personal Representative of the Estate of Sergey Peklun, and Viktoria Peklun's Cross-Motion for Summary Judgment, **ECF No. [52]**, is **DENIED**.

**DONE AND ORDERED** in Chambers in Miami, Florida, this 7th day of December, 2015.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record